UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**RECEIVED**
SEP 2 8 2009
Sep 28, 2009
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

GARY FREDERICO ELLISON
_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

vs.

PAUL BIEBLE
_____

Case No: 09 C 5075
09cv5075
(To be supplied by the Clerk of this Court)

(Enter above the full name of ALL
defendants in this action. Do not
use "et al.")

CHECK ONE ONLY:     AMENDED COMPLAINT

✓ _____ COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
U.S. Code (state, county, or municipal defendants)

_____ COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
28 SECTION 1331 U.S. Code (federal defendants)

_____ OTHER (cite statute, if known)

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR
FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

I.  **Plaintiff(s):**

   A. Name: GARY FREDERICK ELLISON

   B. List all aliases: _____

   C. Prisoner identification number: K81210

   D. Place of present confinement: MENARD CORRECTIONAL

   E. Address: P.O. BOX 711, MENARD ILLINOIS 62259

   (If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II. **Defendant(s):**
   (In A below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in B and C.)

   A. Defendant: PAUL BIEBLE

      Title: CHIEF JUDGE FOR THE JUDICIAL CIRCUIT OF COOK

      Place of Employment: _____

   B. Defendant: _____

      Title: _____

      Place of Employment: _____

   C. Defendant: _____

      Title: _____

      Place of Employment: _____

   (If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

Revised 9/2007

## III. PREVIOUS LAWSUITS

1. Ellison V Sheahan et al, No. 06 C ...
2. Filing date Oct 06
3. Gary Ellison, plaintiff
4. Micheal Shehan, and 4 sheriffs, defendants.
5. Filed in the Northern District - this Court
6. Before Judge Coar
7. Claim made was cruel and unusual punishment
8. Voluntarily dismissed
9. 3/27/2007, approximated date of disposition


1. Ellison V Minnear et al, No. 08 C 3247
2. Filing date June 08
3. Gary Ellison, plaintiff
4. Micheal Minnear, Brad Curie, and 4 John Doe sheriffs, defendants
5. Filed in the Northern District - this Court
6. Before Judge Leinenweber
7. Claim made was conspiracy, and cruel and unusual punishment
8. Appeal pending
9. Before the Appellate Court


1. Ellison V Hulick et al, No. 09 414 DRH
2. Filing date June 09
3. Gary Ellsion, plaintiff
4. Hulick and Menard Eye Doctor (John Doe)
5. Filed in the Southern District
6. Before Judge Herndon

7. Claim made was failure to treat medical condition.

8. Pending disposition.

9. Pending.


1. Ellison V Minnear et al, No. 09 431 DRH

2. Filing date June 09

3. Gary Ellison, plaintiff

4. Micheal Minnear, Brad Curie, and 4 John Doe sheriffs

5. Filed in the Southern District

6. Before Judge Herndon

7. Claim made is conspiracy, and cruel and unusual punishment.

8. Pending disposition.

9. Pending

## IV. STATEMENT OF CLAIM:

1) In March of 2001, the Illinois State Police began investigating the Plaintiff for the felony of Murder.

2) In March of 2002, the Plaintiff was incarcerated in the Illinois Department of Correction.

3) On July 1st, 2003, the Plaintiff was being housed in Illinois River Correctional and had been consistantly housed in Illinois River for approximately 15 months upon that date.

4) Illinois River is located in Illinois 9th judicial circuit, in the county of Fulton.

5) Defendant Bible is the Chief Judge for the Illinois judicial circuit of Cook, located in the county of Cook.

6) On July 1st, 2003, Defendant Bieble authorized the Use of Eavesdropping Devices upon the Plaintiff. (exibit 1 )

7) The application for the Use of Eavesdropping Devices presented to Defendant Bieble duly informed Defendant Bieble that the authorizing state attorney and investigator were requesting permission to surveil the Plaintiff while the Plaintiff was incarcerated in Illinois River, within the 9th judicial circuit. (exibit 4)

8) However, pursuant to Illinois law 725 ILCS 5/108B-5(c), REQUIREMENTS FOR

ORDER OF INTERCEPTION, Defendant Bieble is not legally empowered to authorize the Use of Eavesdropping Devices which, from inception, begin in the 9th judicial circuit.

9) According to Illinois law 725 ILCS 5/108B-5(c), the jurisdiction in which Defendant Bieble is empowered to authorize the Use of Eavesdropping Devices is contained within the judicial circuit of Cook.

10) The 9th judicial circuit is located approximately 150 miles south of the judicial circuit of Cook.

11) During the Use of Eavesdropping Devices upon the Plaintiff, IDOC employees forced the Plaintiff into a segregation cell with an informant for the purpose of executing the recording of the Plaintiffs communication. (exibit 6, line 11-19)

12) On July 31st, 2003, the states authorization to use Eavesdropping Devices upon the Plaintiff concluded. (exibit 1)

13) According to Illinois law 725 ILCS 5/108A-8, Defendant Bieble is mandated to servance of notice to the party named in the surveillance order enclosed as an exibit, the Plaintiff.

14) Defendant Bieble has not served the Plaintiff notice as of September 22, 2009, approximately 6 years beyond the period of timely servance, which deadline was November 31st, 2003.

15) In relation to the aforementioned investigation of the Plaintiff for the felony of Murder, timely notice of the Use of Eavesdropping Devices upon the

Plaintiff would have given the Plaintiff notice that material evidence existed, which material evidence was recordings of the Plaintiff and informant Tommy Armstrongs conversation while in Illinois River Correctional.

16) Informant Armstrong was the consenting party to the recording and a witness for the state against the Plaintiff in the Plaintiffs trial for murder.

17) The recorded evidence developed during the Use of Eavesdropping Devices upon the Plaintiff directly impeached Armstrongs trial testimony that the Plaintiff confessed to Armstrong of committing Murder.

18) During the states Use of Eavesdropping Devices upon the Plaintiff, informant Armstrong explicitedly asked the Plaintiff if the Plaintiff had murdered Robert Pierce and the Plaintiff responded " no ", where the reocrding developed during the Use of Eavesdrppping Devices at that particular time was duly turned over to Defendant Bieble pursuant to Illinois law.

## V. RELIEF

The Plaintiff requests relief through the Court issuing a DECLARATORY JUDGMENT as to:

1) whether the unlawful authorization for the Use of Eavesdropping Devices upon the Plaintiff qualifies as prejudice and/or a prejudicial act against the Plaintiff.

2) possible violation of the Plaintiffs right to due process if Defendant Bieble assigns the Plaintiffs petition for Post Conviction relief to a Cook County Circuit Court Judge subsequent the Plaintiffs timely filing of Motion for Change of Venue from the judicial circuit of Cook where:

    A - the Plaintiff asserts in the Motion For Change of Venue that the contents of the petition for Post Conviction relief request consideration for relief for constitutional violation stemming directly from state actions afforded by the Chief Judges unlawful act.

    B - the Plaintiff asserts that any Cook County Circuit Court Judge assigned the consideration of the Plaintiff petition for Post Conviction relief will be reserved in blind and unbias ruling on behalf of the Plaintiff, which reuling are outright adverse or indirectly adverse to the Chief Judges prior actions in relation to the Plaintiffs petition for Post Conviction relief.

3) whether the U.S. District Court will, upon appeal of the Plaintiffs denied motion to change venue from the judicial circuit of Cook, conclude that the occurrance of Judge Biebles authorization mandates the reversal of the denied Motion to Change Venue to Du Page County.

Next, the Plaintiff request relief through the Court ruling that:

1)Defe

Next, the Plaintiff requests relief through the Court ruling that:

1) Defendant Bieble violated the Plaintiffs 5th amendment right to Due Process, and the Plaintiffs 14th amendment right to Equal Treatment under the laws of the state of Illinois in authorizing the Use of Eavesdropping Devices to occur in the 9th judicial circuit, wherein, Defendant Bieble committed acts outside of his judicial capacity and acted in the ' clear absence of all jurisdiction '.

2) Defendant Bieble caused, aided or prompted violation of the Plaintiff 4th amendment right to both Search and Seizure and False Imprisonment, the Plaintiffs 5th amendment to Due Process and the Plaintiffs 8th amendment to Cruel and Unusual Punishment in authorizing the unlawful Use of Eavesdropping Devices, where Defendant Biebles authorization prompted IDOC employees to commit unlawful act which likely would not have occurred without the authorization to surveil the Plaintiff.

3) Defendant Bieble violated the Plaintiffs 5th amendment to Due Process in failing to timely serve the Plaintiff notice or inventory pursuant to Illinois Law.

Lastly the Plaintiff requests relief through the Court ordering that:
Defendant Bieble is to pay the Plaintiff 10 million dollars in punitive damages.

VI. The Plaintiff demands that the case be triad by a jury: YES.

## CERTIFICATION

By signing the Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief. I understand if this certification is not correct, I may be subject to sanctions by the Court.

Signed this 22nd, day of Sepetember, 2009.

Gary Frederico Ellison

K81210

PO Box 711

Menard Illinois 62259

Exhibit # 1

COUNTY OF COOK )
)
IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

IN RE: <u>THE MATTER OF JUDICIAL APPROVAL</u>
<u>SECTION 108A-3</u>

FELONY: MURDER                                                         NO. 2003COH-052

Now comes the undersigned applicant and states as follows:

~~1. I, Special Agent Michael Minniear #4638, a law enforcement officer, believe that the above-captioned~~ felony has been, is being or are about to be committed, based upon the facts and circumstances set forth in the attached affidavit which is incorporated into and made a part of this application.

2. That the party to the conversations to be monitored has consented to such monitoring and the written consent of said party is attached to and incorporated as part of this application.

3. That the State's Attorney's Authorization has been granted for this application and a signed State's Attorney's Authorization for Application for Judicial Approval for Use of Eavesdropping device (audio and/or video) is attached to and incorporated as part of this application.

4. That to the best of my knowledge no previous application has been made involving the below described parties to the conversation to be monitored.

THEREFORE, I request that an order for the Use of an Eavesdropping Device (audio and/or video) be issued to the undersigned applicant and Cook County Assistant State's Attorney's: Scott Cassidy, Thomas Hennelly, Kevin Byrne, Russell Baker, William Delaney, Linas Kelecius, Michael McHale, Eugene Richards,, Daniel Weiss; Cook County State's Attorney's Office Technicians: Al Nakayama, Ken Maicke, Jerry Kling, Elvia Torres, Cook County State's Attorney's Office Investigators: Chief Ron Kelly, Deputy Chief Frank Nelligan, Larry Tuider, John Duffy, Curtis Conley, Brian Killacky, Fernando Cervantes, Illinois State Police Officers: Leach #2369, Casey #3257, Piccoli #3190, Murray #3547, Cooper #2244, Nowaczyk #2346, Hunt #3630, Surz #4951, Techs: McLeese #3881 and any other authorized law enforcement personnel, to record any and all conversations from July 1, 2003 at 4:00 p.m. until July 31, 2003 at 3:59 p.m. between the following individuals whose conversations are to be overheard: ▮▮▮▮ consenting party, and Gary Ellison and other unknown co-conspirators.

FURTHER, I request that the order of Use of an Eavesdropping Device (audio and/or video) not terminate automatically when the above described communication is overheard (overseen) and/or recorded because I have reasonable grounds based on the facts in the said affidavit to believe that additional conversations of the same type may occur.

I, Special Agent Michael Minniear #4638, being duly sworn and under oath, state that I am a law enforcement officer employed by Illinois State Police and that the above information is true and correct.

Date: July 1, 2003

Time: 2:35 P.M.                       Applicant S/A _Michael J Minniear_

Subscribed and sworn
to before me on
___7-1___ 2003
                                       _Paul P Biebel_ 1688
                                       JUDGE OF THE CIRCUIT COURT OF COOK COUNTY

EXIBIT #1

1124

STATE OF ILLINOIS     )
                      )
COUNTY OF COOK        )                    NO. 2003COH-052

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CRIMINAL DIVISION

### AFFIDAVIT

I, Special Agent Michael Minniear #4638, being duly sworn under oath states as follows: I am employed as and have been employed as a police officer for seven and one half (7 1/2) years with the Illinois State Police. I am presently assigned as a Special Agent to the Illinois State Police, Zone 1 Investigations, where my duties include the investigations of homicides and general and violent offenses. I have also successfully completed training at the ISP Academy, as well as several specialized investigative courses. The facts contained in the application are based on my own personal observations, as well as the observations of other officers working on this investigation.

That I am currently involved in an investigation of the death of Robert A. Pierce, hereinafter referred to as Pierce. Pierce's bound body was discovered along the south shore of the Little Calumet River just east of Halsted Street, Harvey, Illinois at approximately 8:35 A.M. on February 8, 2001. Pierce's body was tied up with duct tape and the head was covered with a black plastic bag which was duct taped closed. The Cook County Medical Examiner's Office ruled the cause of Pierce's death as asphyxiation.

The continuing investigation into Pierce's death revealed the following information:

Pierce had lost his wallet sometime during the evening of Saturday, January 27, 2001, possibly just outside the China Palace restaurant on Indiana Avenue in Riverdale after purchasing food there.

At 4:07 A.M. on January 28, 2001, someone used Pierce's Discover credit card, which was in the wallet he lost, to recharge the pre-paid calling card for the Cingular Wireless cellular telephone registered to GARY ELLISON. At 4:13 A.M., someone attempted to use Pierce's Travel Extras Mastercard to purchase more minutes on the pre-paid calling card on ELLISON'S account, but the transaction was denied.

Over the course of two days, Sunday, January 28, 2001 and Monday, January 29, 2001, Pierce telephoned his credit card companies, reported his cards lost or stolen, and ordered replacement cards.

The last time anybody saw Pierce alive was when he left work at the Illinois Toll Highway Authority warehouse in Naperville on Monday, February 5, 2001, at approximately 4:00 P.M. The last time anybody spoke with Pierce was a telephone conversation between Pierce and his girlfriend Susan Pierce which ended at approximately 6:47 P.M. on Monday, February 5, 2001.

Between 1:02 A.M. and 1:50 A.M. on Tuesday, February 6, 2001, six telephone calls were placed from Pierce's residence to the automated systems for two of Pierce's credit cards changing the Personal Identification Numbers (PINs).

At 2:14 A.M. on February 6, 2001, the surveillance camera at the ATM at the Heritage Bank at 550 E. Sibley Blvd. in Dolton records video of a subject now known to be ELLISON wearing a hooded sweatshirt and gloves driving up to the ATM in a white Ford Taurus and attempting to use Pierce's Capital One Credit Card for a cash advance. Pierce owned a white 1995 Ford Taurus identical to the one being driven by ELLISON. During an interview on March 30, 2002, ELLISON admitted he was the person in the video and still photographs taken from the video wearing the hooded sweatshirt trying to use Pierce's credit card. ELLISON also admitted the car he was driving was Pierce's car. The Heritage Bank is less than two miles from ELLISON'S mother's house at 13824 So. Wabash, in Riverdale, IL.

Pierce failed to show up for work at 8:00 A.M. on Tuesday, February 6, 2001.

Pierce's Capital One credit card was used several times at different locations between Tuesday, February 6, 2001 and Thursday, February 8, 2001:

* At 7:24 P.M. on February 6, Pierce's credit card was used at a Citgo gas station on Vincennes Avenue in Chicago to purchase $12.04 worth of gas.

EXIBIT #2

1121

At 2:52 A.M. on February 7, Pierce's credit card was used at the Mobil gas station on 141 Street in Riverdale to purchase $7.84 worth of gas, and attempted to be used to get $50 in cash but that transaction was denied. The Mobil station is less than two miles from ELLISON'S mother's house at 13824 S. Wabash, in Riverdale, IL.

* At 7:16 A.M. on February 7, Pierce's credit card was used at Sanford's Marathon gas station at 1201 West 87th Street, Chicago for two cash advances from the ATM - one for $60 and one for $100. Sanford's Marathon gas station is four blocks north and one block west of ELLISON'S grandmother's house at 9019 S. May. ELLISON frequently stays at his grandmother's house.

* At 7:16 A.M. on February 8, Pierce's credit card was used at the same Citgo gas station from February 6 to purchase $22.99 worth of gas.

ELLISON'S sister Maria told investigators ELLISON drove her to a basketball game at Thornton High School on Wednesday, February 7, 2001, at approximately 7:00 P.M. in Pierce's white Ford Taurus. Pierce's body was discovered at approximately 8:35 A.M. in the Little Calumet River just east of Halsted Street. The discovery was made by a student on his way to Thornton High School.

On Saturday, February 10, 2001, ELLISON switched cars with his cousin Lynetta Lampkin. ELLISON took Lampkin's Pontiac Grand Am and gave Lampkin Pierce's Ford Taurus. Later that day, ELLISON was involved in an accident completely wrecking Lampkin's Grand Am. ELLISON told Lampkin to keep Pierce's Taurus.

On March 10, 2001, Chicago Police stopped Anton Carter while he was driving Pierce's Taurus. Carter explained he got the car from his girlfriend Lampkin, who got the car from her cousin ELLISON. The license plates on Pierce's car at that time were AAP 435 which were registered to Veola Baker on a 1995 white Ford Taurus. Baker lived at 9008 S. May, Chicago, which was across the street and approximately four houses north of Ellison's maternal grandmother Evelyn Love. Baker reported her license plates missing or stolen on February 10, 2001, but first noticed there were different license plates on her vehicle on Thursday, February 8, 2001, at approximately 1:30 P.M. The license plates which were on Baker's Taurus were T 689 396, the license plates registered to Pierce.

On March 13, 2001, Zone 1 Agents interviewed ELLISON at Riverdale P.D. after his arrest by Riverdale P.D. on domestic battery charges. Agents questioned ELLISON about his knowledge and possession of the white Ford Taurus. Agents did not question ELLISON at all about Pierce's death. ELLISON denied ever having the Ford Taurus despite being told Lampkin had said she got the car from him and several other people had said they had seen ELLISON driving the Taurus.

On March 30, 2002, Zone 1 Investigations agents arrested ELLISON on two outstanding warrants for Domestic Battery and violation of his parole. At the time of his arrest, ELLISON had three guns in his possession. Region 1 Investigations agents interviewed ELLISON extensively about his role in the death of Pierce. ELLISON denied any involvement in the death of Pierce, and said he had received Pierce's white Ford Taurus from his father Albert Kinkle. Kinkle said he never had possession of Pierce's Taurus. Kinkle told agents ELLISON contacted him asking for his help in trying to get money from some credit cards. Kinkle told ELLISON he needed to change the Personal Identification Numbers (PINs) on the credit cards quickly before the owner of the cards could change the numbers or cancel the cards. Kinkle said ELLISON showed up at Kinkle's house a few days after that conversation saying he could not get any money out of them. Kinkle said ELLISON had a wallet containing several credit cards with Pierce's name on them.

Kinkle took and passed a polygraph exam regarding any and all involvement in the Pierce case. ELLISON refused to take a polygraph exam.

Agents again asked ELLISON where and when did he get PIERCE'S white Ford Taurus. ELLISON again related the story about receiving the Taurus from his father Albert Kinkle in front of 294 E. 157th Street, Harvey, Illinois. ELLISON said Kinkle asked him to take the Taurus and a credit card which Kinkle gave to ELLISON, and go to the nearest ATM to draw some money from the credit card. ELLISON stated he went through a drive-up ATM machine at a bank on 147th Street (Sibley Boulevard.) It was at this time ELLISON admitted he was the person wearing the hooded sweatshirt and gloves pictured in the surveillance video from the ATM at Heritage Bank, 550 E. Sibley Boulevard on 02/06/01 at 2:14 A.M.

ELLISON said he had telephoned Kinkle to ask for some money in the late evening or early morning hours on a date prior to 02/06/02. Kinkle supposedly said he had a way to get some money if ELLISON was willing to help Kinkle. Kinkle said the two of them could sell some Cannabis which ELLISON'S sister Laquita Price was "holding." Kinkle came and picked up ELLISON in Kinkle's Chevrolet Blazer, but had ELLISON drive from that

EXHIBIT #3

1120

into the house and retrieved a backpack containing just under a pound of Cannabis which was under Laquita's bed. Kinkle directed ELLISON to driv     a location which ELLISON described     being about three blocks west of Indiana Avenue in Riverdale. ELLISON said when they got to the location, Kinkle had ELLISON park along the east side of the street with the driver's side of the Blazer against the curb. Kinkle got out of the Blazer, took the backpack containing the Cannabis with him, and disappeared through the gangway between two houses on the east side of the street. Kinkle was gone for approximately one half hour and returned with the backpack saying the deal did not go through, and there was no money.

The R/As asked ELLISON to direct them to the location in Riverdale where he was parked for half an hour waiting for Kinkle. The R/As and ELLISON got into R/A Coopers vehicle and left the Oak Forest Police station for the Riverdale area. ELLISON directed the R/As to the area of 14100 South Michigan Avenue, Riverdale, Illinois. The R/As noticed this location was almost directly parallel to and three blocks west of PIERCE'S house. The R/As then drove to the area of the Little Calumet River and Halsted Street, and stopped along the curb just east of Halsted Street on Calumet Boulevard, Harvey, Illinois. R/A Cooper asked ELLISON if he knew where he was, and ELLISON said, "Yeah, this is where the body popped up." The R/As asked ELLISON how he knew this information. ELLISON said this location was right along a school bus route, and everyone at Thornton High School was talking about the body on Thursday, February 8, 2001. ELLISON said that was when he first learned of the connection between PIERCE and the white Ford Taurus ELLISON was driving. The R/As remembered this was the third different time ELLISON had given as to when he found out about the connection between PIERCE and the white Ford Taurus. Earlier in the interview, ELLISON told the R/As he first learned about the connection after he had given the car to his cousin Lynetta on February 10, 2001, and ELLISON had done some checking into the car's history on his own. Then later, ELLISON told the R/As he had heard something about the connection between PIERCE and the white Ford Taurus and a possible connection between PIERCE and Kinkle. Because of that information, ELLISON said in the late evening of Tuesday February 6, or the early morning of Wednesday, February 7, 2001, he switched license plates between PIERCE'S white 1995 Ford Taurus and a white 1995 Ford Taurus owned by Veola Baker.

On May 3, 2002, Kinkle provided a written statement in which he described a conversation between ELLISON and Kinkle which took place in Kinkle's kitchen sometime in late February, 2002. Kinkle said in that conversation ELLISON admitted he and some other people were involved in the death of Pierce.

On June 26, 2002, ELLISON pled guilty to the charges of Unlawful Use of Weapon by a felon stemming from the March 30, 2002 arrest. He was sentenced to four years imprisonment in the Illinois Department of Corrections. ELLISON is currently incarcerated at Illinois River near Peoria, Illinois, and is scheduled to be released August 20, 2003.

███████ (a fictitious name given to him by the State Police for safety purposes), a confidential informant, has been placed on the same tier as ELLISON at Illinois River and Jones said ELLISON told him he was involved in a homicide which happened in 2001. ELLISON told ███ he was alone when he committed the homicide and that is why he is not telling the police anything. ELLISON said that he had dumped the body in a river or ravine, that the State Police were after him for that homicide, and that because the State Police were after him he fled to Dover, Delaware for several months. The investigation has revealed Ellison did flee to Dover, Delaware away from this jurisdiction after being questioned about the Pierce matter.

I believe that when ███ and Ellison meet face to face, the two will have a conversation in which Ellison provides details about the murder to ███. I am requesting judicial authorization to overhear and record this meeting and any subsequent conversations between ███ and Ellison involving information about this murder.

That based on the above foregoing, I believe the offense of Murder has been, is being, or is about to be committed.

Subscribed & Sworn to
before me this 1st day
of July, 2003
_____ 1655
Judge

EXIBIT #4

_____
AFFIANT

1119

SUBSCRIBED AND SWORN T

before me on this ___1st___ day of

___July___, 2003

_____Paul P Bu____ 1688_____
JUDGE OF THE CIRCUIT COURT OF COOK COUNTY

TIME: 2:35 pm
DATE: 7-1-03

EXIBIT #5

1118

(Exhibit 4)

```
 1      Q    What time frame was he due to be
 2  released?
 3      A    Within, I believe, a month or two of
 4  the conversation.
 5      Q    And did the conversation take place?
 6      A    Yes.
 7      Q    And how long after the conversation was
 8  the defendant released?
 9      A    It was approximately a month, I
10  believe.
11      Q    And where did that conversation take
12  place?
13      A    In the segregation unit of Illinois
14  River Correctional Center.
15      Q    And did the conversation pursuant to
16  the confidential overhear obtained, did it
17  happen the first time that it was obtained or
18  did you have to obtain a second confidential
19  overhear?
20      A    I had to obtain a second confidential
21  overhear because the logistics of performing the
22  actual overhear took longer than expected.
23      Q    And so time had elapsed?
24      A    Yes.
```

Handwritten annotations: "Mistruth (other CO#)"; "Due Process Sent to seg for no reason"

R-130

EXIBIT #6